# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DeWAYNE NOLAN LOGAN,<br><br>       Plaintiff,<br><br>   v.<br><br>JOHN DOE I, et al.,<br><br>       Defendants. | CASE NO. 1:02-cv-06428-AWI-SMS PC<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BE GRANTED<br><br>(Doc. 82) |

I.   Findings and Recommendations Addressing Defendant's Motion for Summary Judgment

   A.   Procedural History

Plaintiff DeWayne Nolan Logan ("plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. This action is proceeding on plaintiff's second amended complaint, filed January 24, 2003, on plaintiff's remaining claim against defendant Adams for denial of access to the courts.[1] On March 9, 2007, defendant filed a motion for summary judgment. Plaintiff filed an opposition on March 22, 2007, and defendant filed a reply on March 23, 2007.[2]

///

---

[1] On May 29, 2003, plaintiff's retaliation and conspiracy claims were dismissed from this action, without prejudice, for failure to state a claim upon which relief may be granted, and on March 3, 2004, defendants' motion to dismiss plaintiff's Eighth Amendment claims and access claim against defendants Cuevas, Cote, and Espinosa for failure to exhaust was granted. (Docs. 23, 49.)

[2] Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the court in an order filed on May 15, 2003. Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988). (Doc. 22.)

1

On April 5, 2007, plaintiff filed a surreply. (Doc. 88.) Neither the Federal Rules of Civil Procedure nor the Local Rules provide a right to file a surreply. Plaintiff did not seek and was not granted permission to file a surreply and the surreply shall not be considered. The court notes for the record that even if it had considered the surreply, the result of this Findings and Recommendations would not have been altered.

B. <u>Summary Judgment Standard</u>

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). It is the moving party's burden to establish that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. <u>British Airways Board v. Boeing Co.</u>, 585 F.2d 946, 951 (9th Cir. 1978).

"When the moving party does not have the burden of proof on the issue, he need show only that the opponent cannot sustain his burden at trial." <u>Calderone v. United States</u>, 799 F.2d 254, 259 (6th Cir. 1986) (quoting from W. Schwarzer, <u>Summary Judgment Under the Federal Rules: Defining Issues of Material Fact</u> 99 F.R.D. 465, 487 (1984)). "But where the moving party has the burden - the plaintiff on a claim for relief or the defendant on an affirmative defense - his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." <u>Id</u>. Thus, as to plaintiff's motion for summary judgment, plaintiff must demonstrate there is no triable issue as to the matters alleged in his complaint. <u>Id</u>. This requires plaintiff to establish beyond controversy every essential element of his retaliation claims. <u>Fontenot v. Upjohn Co.</u>, 780 F.2d 1190, 1194 (5th Cir. 1986). Plaintiff's evidence is judged by the same standard of proof applicable at trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986).

As to defendant's motion for summary judgment, "where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

3

1   In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

  C. Undisputed Facts[3]

1. Plaintiff DeWayne Nolan Logan, CDCR T-21600, was sentenced following a lawful judgment of the Superior Court of the State of California, in and for the County of Sacramento, No. 00F04115, imposing a sentence of forty-one years to life in state prison.
2. On January 9, 2002, an incident occurred at the California Substance Abuse Treatment Facility (CSATF) resulting in serious injuries to staff. As a result, the prison was locked down until approximately June 2, 2002, at which point the prison went on modified programming until approximately May 31, 2003.

---

[3] "Any party opposing a motion for summary judgment or summary adjudication shall reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts that are undisputed and deny those facts that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission or other document relied upon in support of that denial." Local Rule 56-260(b). In this instance, plaintiff did not comply with the Local Rule. Therefore, defendant's Statement of Undisputed Facts is accepted except where contradicted by plaintiff's complaint and declaration submitted in support of his opposition. Plaintiff's complaint and declaration may be treated as opposing affidavits to the extent that they are verified and sets forth admissible facts (1) within plaintiff's personal knowledge and not based merely on plaintiff's belief, and (2) to which plaintiff is competent to testify. Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004); Johnson v. Meltzer, 134 F.3d 1393, 1399-1400 (9th Cir. 1998); McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987); Lew v. Kona Hosp., 754 F.2d 1420, 1423 (9th Cir. 1985).

3. When an institution is placed on lockdown, or a state of emergency is declared by the warden, daily status reports are issued and circulated which outline information concerning the plan of operation for that day, or the next few days. These reports are called Program Status Reports, and outline the Plan of Operation and include notification to staff and inmates. These reports are generated until the time that the institution, and/or specific facility returns to normal program operation.

4. Between January 8, 2002, through May 30, 2003, Program Status Reports were issued for C-Facility at CSATF. These reports identify what type of program is available to the inmates; note the event that precipitated the lockdown or program modification; and identify what areas and inmates are affected. The report also specifies whether inmates must be escorted and whether they have access to the day room, recreation yard, canteen, visits, and phone calls. Some of the reports also include an anticipated date for return to a normal program, or set schedules for other events.

5. Following the January 9, 2002, incident, reports were generated memorializing the facts surrounding the attempted murder of the correctional officer on C-Facility. The reports reflect the enormity of the incident, summarize the events, and identify the staff and inmates that were involved.

6. The Program Status Reports reflect the events related to the operations of C-Facility between January 8, 2002, and the resumption of normal program on April 1, 2003.

7. The entire population of C-Facility was placed on lockdown status on December 31, 2001, because of the riot. On January 8, 2002, it was determined that all inmates, with the exception of the Northern Hispanic inmates (inmates affiliated with a disruptive group, most of whom are Hispanic and from Northern California) could be released to normal program, including yard access.

8. On January 9, 2002, during yard release, one white inmate attacked another with a weapon. As the yard was being recalled an African-American inmate incited other inmates to join him in an assault on the correctional officers who were searching inmates before they entered their housing units. As other staff responded to the incident, they too were assaulted.

|  |  |
|---|---|
|  | Twenty-two inmates were identified as suspects in the assaults. A total of twenty-one staff members reported injuries as a result of the incident. Nine staff members were transported to local hospitals for evaluation and treatment. |
| 9. | On June 27, 2002, a meeting was held between Captain Cuevas, his staff, and selected inmates representing the African-American inmate population in C-Facility. The purpose of the meeting was to notify the inmates about the proposals for modifying the lockdown in C-Facility. A decision was made to open the day-room for African-American inmates who were not affiliated with a gang or disruptive group, on July 8, 2002. |
| 10. | The goal of this modification was to observe the controlled release of inmates, and if the program ran without further acts of violence, the day-room would then be opened for the remaining African-American population. If the day-room program proved disruptive, the releases would be stopped and evaluated before another attempt was made to start releasing from the lockdown. |
| 11. | On July 19, 2002, all African-American inmates were inmates were allowed access to the day-room on a rotational basis. |
| 12. | On August 1, 2002, an administrative decision was made to open the exercise yard to all inmates for a modified program, and the plan was to release one building at a time, on a rotational basis. The plan was implemented on August 4, 2002. |
| 13. | On August 8, 2002, the plan was modified to exclude Southern Hispanic, Fresno Bulldogs, and Northern Hispanic inmates (inmates considered to be affiliated with disruptive groups). The releases were then limited to one tier of one building at a time, on a rotational basis. |
| 14. | On November 15, 2002, C-Facility was again locked down because of a battery on an inmate with a weapon, on November 14, 2002. There had also been several other incidents of weapons possession. |
| 15. | The modified outdoor exercise schedule was resumed on November 27, 2002. Hispanic and white inmates continued to be locked down. White inmates were released from lockdown on December 3, 2002. |

///

16. African-American inmates were returned to lockdown status because of a battery on a peace officer on February 13, 2003. It was necessary to evaluate this incident to determine if it was an isolated incident of opportunity, or was a planned, organized assault.

17. All of C-Facility was placed on lockdown status on March 21, 2003, to search the entire facility for weapons. Numerous weapons had been found on two prior, separate occasions. The searches were completed, and the continuation of the lockdown was evaluated.

18. It was determined on March 26, 2003, that C-Facility could resume normal operations.

19. On March 28, 2003, two inmates affiliated with the Fresno Bulldogs attempted to murder a Southern Hispanic inmate. All inmates were denied access to the yard until April 1, 2003, when normal operations were resumed for all inmates except the Bulldogs.

20. On January 23, 2002, plaintiff filed an administrative grievance, Log No. CSATF-C-02-00427, in which he alleges that defendant Adams violated prison rules and his constitutional rights by declaring a state of emergency on January 9, 2002, that interfered with his accessing the prison law library.

21. On March 27, 2002, Correctional Lieutenant G. Mills and Associate Warden B. Espinosa, issued the prison's first level review. In that review, the authors wrote, "[a] review of your CDC 602 appeal and the Lockdown Plan of Operations revealed that as long as proof is provided that you have a court case pending you would be allowed access to the law library. You were provided with a Request for Interview form on which you are to list the case number and all pertinent information regarding your case. This form was forwarded to the law library. Upon confirmation from the Librarian that you have a pending case, a ducat will be issued. This portion of your appeal is granted. The Warden is not abusing his authority; due to the assault on staff that occurred on January 9 the entire Facility was placed on "State of Emergency" pending outcome of the above-mentioned investigations and the implementation of a new Program. This portion of your appeal is denied. Adverse personnel actions are only to be recommended by supervisory staff and the results of investigations, and any reports or adverse actions concerning staff are confidential. The Warden has not violated your rights but has issued directives in order to secure the safety of all inmates and staff on

|   |     |   |
|---|-----|---|
| 1 |     | Facility IV-C as well as the institution. This portion of your appeal is denied. A copy of the |
| 2 |     | Lockdown Plan of Operations is attached." |
| 3 | 22. | On May 2, 2002, a second level appeal response was issued to plaintiff. In that response, it |

1     Facility IV-C as well as the institution. This portion of your appeal is denied. A copy of the
2     Lockdown Plan of Operations is attached."
3  22.  On May 2, 2002, a second level appeal response was issued to plaintiff. In that response, it
4     was explained that a state of emergency had been declared during the period of time plaintiff
5     claims having not had access to the law library. Plaintiff was referred to California Code of
6     Regulations, Title 15, § 3383, relative to states of emergency and the guidelines applicable
7     to such circumstances. Plaintiff's grievance was denied on the basis that he had been
8     provided access to the law library.
9  23.  On June 27, 2002, a Director's level appeal decision was issued by the Inmate Appeals
10    Branch (IAB). In that appeal response, staff noted that plaintiff alleged "that while on
11    lockdown status he was denied appropriate access to the law library. He states that on
12    January 9, 2002, a 'state of emergency' was declared by the warden. He subsequently
13    submitted three requests for forms and/or access to the law library for research; however,
14    staff ignored his request. Based on the above [plaintiff] . . . . contends that his rights have
15    been violated. The [plaintiff] . . . . requests that his appeal be processed as a staff complaint
16    against Warden Adams." Staff also noted as to the second level response that "[i]t is staff's
17    position that safety of staff and inmates is paramount over inmate programs and activities.
18    Therefore, normal activities and programs are temporarily suspended when it is necessary
19    to take measures to ensure that safety and security has been stabilized. The institution states
20    that on January 9, 2002, as a result of a serious assault on staff, the entire facility was placed
21    on a 'state of emergency.' The institution points out that [plaintiff] . . . . was provided with
22    the form needed by the law librarian, who ducats priority cases after verification of a pending
23    court case. The institution also points out that [plaintiff] . . . . has been afforded every
24    opportunity to access the law library within established procedures. The institution maintains
25    that [plaintiff] . . . . has not been denied access to the law library and his rights have not been
26    violated." In responding to the third level, staff wrote, "[Plaintiff's] allegations of staff
27    negligence in not providing him access to the law library are unfounded. An institution may
28    temporarily suspend any nonessential facility operation, procedure, service or function, and

8

the normal time limits or schedules for such activity in order to prevent, contain or control a widespread facility disturbance. Each incident that leads to a lockdown is different as is the extent of the area requiring suspension of any nonessential facility operation, procedure, service or function. In this case, the institution's responses at the First and Second Level of Review are thorough and are accepted as CDC's position on this issue. No relief can be provided to [plaintiff] . . . .at the Director's Level of Review."

24. Defendant did not authorize staff or anyone else to deny plaintiff law library access or its services. Moreover, the operational plan implemented by defendant did not deny plaintiff access to the law library or its services. Any inconvenience experienced during the emergency was due to need to ensure the safety and security of the institution, personnel and inmates.

25. Plaintiff admits that on January 9, 2002, there was a prison riot at CSATF resulting in injuries to staff and attempted murder charges. He further admits that following the riot, prisoners were locked down until June 20, 2002, and that once the state of emergency was over, a modified program was operated (*i.e.*, six months for the emergency and approximately one year duration for the modified program).

26. Plaintiff admits that under the state of emergency, while there initially was no library access, staff was able to develop "a plan where [inmates received]. . . . some legal access to the law library." Plaintiff further admits the plan permitted either escort to and from the law library (by way of a priority ducat) or paging (wherein inmates fill out requests for legal materials and the material is provided to the inmate). The program required inmates to demonstrate an actual court deadline between May and July 2002 (a portion of which involved the period of the state of emergency (to June 20, 2002) and the other, the modified program).

27. Plaintiff testified during his deposition that he possessed a verified court deadline between May and July 2002 in <u>Logan v. Blanas, et al.</u>, CIV-S-01-1061 GEB PAN P. Plaintiff explained that he received a fifteen day order that was filed on May 16, 2002, but that when he received the order through prison mail, he only had "nine or ten days total to answer." The "order" to which plaintiff refers was the court's Findings and Recommendations to

9

1  which he desired to file objections.  Plaintiff avers that the court struck his document
2  "because it didn't get there in a timely manner."  Later, plaintiff changed his story to having
3  timely filed his objections but having the objections stricken by the court because he did not
4  include a proof of service because he had difficulty in copying the document for the opposing
5  party.  Plaintiff admits having timely filed the document with the court, but having difficulty
6  providing copies to the other parties.  Plaintiff claims his case was "lost" at that point and
7  thus, was not able to challenge his conviction for which he received life.
8  28.  CIV-S-01-1061 GEB PAN P is actually 2:01-CV-01061 GEB PAN and involves a petition
9  for writ of habeas corpus entitled DeWayne Nolan Logan v. Lou Blanas, et al., filed by
10  plaintiff on May 30, 2001.  On December 6, 2001, the court granted in forma pauperis status
11  and directed respondents to respond to plaintiff's petition.  On January 23, 2002, respondents
12  filed a motion to dismiss on the ground that plaintiff had failed to exhaust state remedies.
13  On February 4, 2002, plaintiff wrote the court seeking documents and "a 42 U.S.C. 1983
14  civil rights application."  On March 28, 2002, the court filed an order noting respondents'
15  motion to dismiss and that plaintiff had notified the court that "the prison began [a] state-of-
16  emergency status as of January 9, 2002 . . . ." and he "has not had access to the law library."
17  Plaintiff was granted a thirty-day extension to respond to respondents' motion to dismiss.
18  With respect to his claim of denial of access to the courts, the court advised him that such
19  claims fell within the scope of 42 U.S.C. § 1983.  On April 25, 2002, plaintiff filed his
20  opposition to respondents' motion to dismiss.  On May 16, 2002, the Magistrate Judge filed
21  Findings and Recommendations, recommending that respondents' motion to dismiss be
22  granted.  In the May 16, 2002, Findings and Recommendations, the judge noted that a
23  "review of court records submitted by respondent from the California Court of Appeal, Third
24  Appellate District, reveals that petitioner filed a notice of appeal from his conviction after
25  filing the instant habeas corpus petition on May 30, 2001.  Petitioner's state appeal is still
26  pending.  The exhaustion requirement is not satisfied if there is a pending post-conviction
27  proceeding in state court.  If a postconviction challenge to a conviction is pending in state
28  court, the federal habeas corpus petitioner must await the outcome of that challenge before

|   |   |
|---|---|
| 1 | his state remedies are considered exhausted." The Magistrate Judge recommended that respondents' motion to dismiss be granted and plaintiff's action be dismissed. Plaintiff filed his objections to the Findings and Recommendations on June 6, 2002, along with a supporting declaration. On June 11, 2002, the court struck plaintiff's June 6, 2002, documents due to plaintiff failing to file a certificate of service. On July 22, 2002, the district court adopted the Magistrate Judge's May 16, 2002, recommendation and granted respondents' motion to dismiss. On August 12, 2002, plaintiff filed a motion for a certificate of probable cause (appealability) along with a notice of appeal. On August 22, 2002, the district court ordered that no certificate of appealability should issue. The court explained that such a certificate may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." The district court further found that as set forth in the Findings and Recommendations filed on May 16, 2002, plaintiff made no substantial showing of the denial of a constitutional right. |

29. On August 29, 2002, plaintiff's request for a certificate of appealability ("COA"), along with the record on appeal, was submitted to the Ninth Circuit Court of Appeals. Plaintiff's motion for a COA was filed on October 2, 2002. On February 25, 2003, the Ninth Circuit denied the COA.

30. Plaintiff contends that defendant implemented the procedure following the riot that restricted his access to the prison law library and thus, the courts. Plaintiff concedes that a procedure was implemented on January 9, 2002. Plaintiff further concedes that one element of the procedure was that only those inmates with approved court deadlines would be permitted to go to the law library. When asked to clarify his claim against defendant, plaintiff claimed, "Warden Adams knew or reasonably should have known that they were required to follow the rules of the D.O.M. and exercise the rules that are set forth by the constitution and the other pertinent rules that are published and given to prisoners." Furthermore, that defendant was responsible for the actions of his subordinates to ensure they follow the rules.

31. Plaintiff's petition for writ of habeas corpus relating to conviction was premature. Dismissal of a premature petition fails to give rise to a constitutional claim related to not being able to

11

1 file objections to the underlying Findings and Recommendations.  Following dismissal of
2 Logan v. Lou Blanas, et al., CIV-S-01-1061 GEB PAN P (the case of which plaintiff
3 complains), plaintiff timely filed virtually the same case challenging his conviction, in Logan
4 v. D.L. Runnels, et al., CIV S-05-0785 GEB PAN P, which is currently before the same
5 district judge, the Honorable Garland E. Burrell, Jr.  Plaintiff suffered no injury as a result
6 of dismissal in Logan v. Lou Blanas, et al., CIV-S-01-1061 GEB PAN P.

32. During the taking of his deposition, plaintiff attempted to expand his claim against defendant to include a claim that the emergency and modified programs violated CDCR (DOM) rules of procedure (referencing DOM 53060.16).  Plaintiff alleged that defendant knew or reasonably should have known that they were required to follow the rules of the D.O.M. and exercise the rules that are set forth by the constitution and the other pertinent rules that are published and given to prisoners.  Finally, plaintiff added a third contention: that defendant was responsible for the actions of his subordinates to ensure they follow the rules.

D. Discussion

1. Denial of Access to the Courts Claim

In his second amended complaint, plaintiff alleges that defendant Warden Adams was responsible for implementing a policy under which only inmates with established court deadlines could access the law library. (Doc. 15, pg. 5.)  Plaintiff alleges that as a result of the policy, his Objection to a Findings and Recommendations was stricken from the record by the court in CIV-S-01-1061 GEB PAN P. (Id.)  Plaintiff alleges that it was impossible to comply with the court's order because he did not have a verified court deadline and was unable to obtain copies, and there were no supplies available for him to create copies.  (Id.)

Inmates have a fundamental constitutional right of access to the courts.  Lewis v. Casey, 518 U.S. 343, 346 (1996).  The right of access is merely the right to bring to court a grievance the inmate wishes to present, and is limited to direct criminal appeals, habeas petitions, and civil rights actions. Id. at 354.  The State is not required to enable the inmate to discover grievances or to litigate effectively once in court. Id.

///

1  Inmates do not have the right to a law library or legal assistance. Id. at 351. Law libraries
2  and legal assistance programs are only the means of ensuring access to the courts. Id. Because
3  inmates do not have "an abstract, freestanding right to a law library or legal assistance, an inmate
4  cannot establish relevant actual injury by establishing that his prison's law library or legal assistance
5  program is subpar in some theoretical sense." Id. Rather, an inmate claiming interference with or
6  denial of access to the courts must show that he suffered an actual injury. Id.

7  Claims for denial of access to the courts may arise from the frustration or hindrance of "a
8  litigating opportunity yet to be gained" (forward-looking access claim) or from the loss of a
9  meritorious suit that cannot now be tried (backward-looking claim). Christopher v. Harbury, 536
10 U.S. 403, 412-15, 122 S.Ct. 2179, 2185-87 (2002). For backward-looking claims such as that at
11 issue here, plaintiff "must show: 1) the loss of a 'nonfrivolous' or 'arguable' underlying claim; 2)
12 the official acts frustrating the litigation; and 3) a remedy that may be awarded as recompense but
13 that is not otherwise available in a future suit." Phillips v. Hust, 477 F.3d 1070, 1076 (9th Cir.
14 2007).

15 The first element requires that plaintiff show he suffered an "actual injury" by being shut out
16 of court. Harbury 536 U.S. at 415, 121 S.Ct. at 2187; Lewis, 518 U.S. at 351, 116 S.Ct. at 2180;
17 Phillips, 477 F.3d at 1076. The second element requires that plaintiff show defendant proximately
18 caused the alleged violation of plaintiff's rights, "[t]he touchstone . . . [for which] is foreseeability."
19 Phillips at 1077. Finally, the third element requires that plaintiff show he has no other remedy than
20 the relief available via *this* suit for denial of access to the courts. Id. at 1078-79.

21 Plaintiff's claim arises from his inability to make photocopies of his Objection, which led
22 to it being stricken from the record by the Magistrate Judge for lack of a certification of service.
23 Plaintiff contends that he lost his case as a result.

24 On May 30, 2001, plaintiff filed a petition for writ of habeas corpus in the Sacramento
25 Division, Logan v. Blanas, et al. 2:01-cv-01061-GEB-PAN, which is the case in which plaintiff
26 alleges he sustained an actual injury as a result of defendant Adam's actions. (Undisputed Fact 28;
27 Comp., pg. 5.) On May 16, 2002, the Magistrate Judge issued a Findings and Recommendations
28 recommending that respondents' motion to dismiss for failure to exhaust available state remedies

13

be granted. (U.F. 28; Def. Exhibit G.) The parties were given twenty days within which to file objections. (Exhibit G.) Plaintiff filed an Objection and a supporting declaration on June 6, 2002. (U.F.. 28.) On June 11, 2002, the Magistrate Judge issued orders striking the filings on the ground that they lacked certificates of service. (Id.) On July 22, 2002, the Honorable Garland E. Burrell issued an Order adopting the Findings and Recommendations in full and dismissing the petition for failure to exhaust available state remedies, a prerequisite to consideration of the claims raised in plaintiff's petition. (Id.) Both Judge Burrell and the United States Court of Appeals for the Ninth Circuit subsequently denied plaintiff's requests for the issuance of a certificate of appealability. (U.F. 28, 29.) On April 21, 2005, plaintiff filed another petition for writ of habeas corpus in the Sacramento Division, Logan v. Runnels, et al. 2:05-cv-00785-GEB-EFB. (U.F. 31.[4]) The petition challenges plaintiff's conviction and is still currently pending. (Id.)

Defendant argues that he did not authorize the denial of law library access or services to plaintiff, and that any failure to provide plaintiff with needed services was not the result of defendant's actions. Defendant also argues that plaintiff suffered no actual injury as a result of his alleged inability to make photocopies of his Objection, given that the action was dismissed based on plaintiff's failure to exhaust and plaintiff is currently challenging his conviction in a pending case filed after the dismissal of the case at issue in this action.

Plaintiff's opposition is largely non-responsive to defendant's arguments. Plaintiff does not dispute that his petition was dismissed for failure to exhaust or that he is currently litigating a petition raising essentially the same claims. Although plaintiff argues he suffered an irreparable loss due to "the loss of an opportunity to litigate," plaintiff fails to elaborate on how that can be so in light of the undisputed facts. (Doc. 84, pg. 2.) To the extent that plaintiff that believes *any* infringement on his ability to litigate his court action as he pleases rises to the level of a constitutional violation, plaintiff is mistaken. Plaintiff must submit evidence demonstrating that he suffered an *actual injury*, which means the loss of a meritorious suit that cannot now be tried. Christopher, 536 U.S. at 412-15, 122 S.Ct. at 2185-87. Plaintiff's petition was not dismissed because plaintiff filed a deficient

---

[4] The court takes judicial notice of its docket.

Objection. The petition was dismissed for failure to exhaust the available state administrative remedies, which was a prerequisite to litigating the petition in federal court, and plaintiff is currently again litigating a petition in federal court challenging his conviction. There is no evidence that plaintiff's petition was dismissed because he failed to file an Objection that was considered by the court, and there is no evidence that plaintiff forever lost the ability to challenge his conviction as a result of the dismissal of the petition.

In addition, plaintiff has submitted no evidence that his inability to make photocopies of his Objection was due to an action or omission of defendant. Although defendant declared a state of emergency, it is undisputed that there was a plan in place so that inmates with court deadlines could obtain access to the law library or materials. Assuming as true that plaintiff attempted to gain access to the library and/or materials pursuant to the plan but his requests were ignored by staff, plaintiff has not submitted any evidence defendant was the proximate cause of plaintiff's inability to gain access to the library or materials pursuant to the plan. Phillips, 477 F.3d at 1077. For the foregoing reasons, defendant is entitled to judgment as a matter of law.

### 2. Policy or Practice in Violation of State Law and Supervisory Liability

In his motion, defendant also contends that plaintiff is attempting to expand his claim beyond what is pled in the complaint. Based on plaintiff's opposition, it appears that plaintiff is now attempting to argue that the state of emergency declared by defendant, and the limitations that resulted, violated the Constitution, was contrary to the Departmental Operations Manual, and was an exaggerated response to institutional concerns. It is unclear if plaintiff is attempting to add additional theories of liability against defendant or if plaintiff simply believes that these arguments are relevant to the claim pled in the complaint.

"Section 1983 . . . creates a cause of action for violations of the federal Constitution and laws." Sweaney v. Ada County, Idaho, 119 F.3d 1385, 1391 (9th Cir. 1997) (internal quotations omitted). "To the extent that the violation of a state law amounts to the deprivation of a state-created interest that reaches beyond that guaranteed by the federal Constitution, Section 1983 offers no redress." Id. The conclusory allegation that the state of emergency and resulting restrictions violated state law does not give rise to a claim for relief under section 1983. Additionally, plaintiff did not

allege a claim against defendant arising the creation of a policy or practice that violated CDCR regulations, and may not now pursue one. Plaintiff was well aware of the identified bases for his claims in this action, and the deadline for amending the pleadings was January 5, 2007. (Docs. 16, 18, 23, 73.)

Further, there is no claim pending arising from a challenge to the state of emergency as an exaggerated response, and there is no supervisory liability claim pending. The sole claim pled in the complaint against defendant is premised on the allegations that as a result of the state of emergency and the restrictions, plaintiff was unable to access the library or legal materials to make copies, which led to the striking of his Objection from the record and caused him to sustain an actual injury with respect to his habeas petition. Given that plaintiff's claim is one for denial of access to the courts, the crux of the inquiry is whether plaintiff suffered an actual injury as a result of defendant's actions or omissions. That issue was addressed in the preceding subsection. Plaintiff may not now expand the scope of this litigation via deposition testimony or his opposition to defendant's motion for summary judgment. See Gilmore v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004).

### E.  Conclusion

For the reasons set forth herein, the court finds that defendant is entitled to judgment as a matter of law on plaintiff's claim against him. As a result of this finding, the court does not reach defendant's argument that he is entitled to qualified immunity.

Based on the foregoing, it is HEREBY RECOMMENDED that defendant's motion for summary judgment, filed March 9, 2007, be GRANTED, thus concluding this action in its entirety.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the

///

///

1 | specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d
2 | 1153 (9th Cir. 1991).

4 | IT IS SO ORDERED.

5 | **Dated: April 17, 2007**               /s/ Sandra M. Snyder
                                            UNITED STATES MAGISTRATE JUDGE